Bacardi v. Coke Stewart Cuba Exports' renewal payment was due in 2006. It couldn't make that payment until 2016. That's a problem under a time-oriented statute. Well, it made the payment, and the payment was received and accepted for six months and then returned. Your Honor, if you look at JA-242, which shows the record of what happened, you see there is a payment. The first line there is a payment that is dated January 2016 that is for the 2006 renewal. There was a separate payment attempt that is marked as reversed. So Cuba Export made it unlawful. I know it was reversed, but the point is the money was actually dispensed several months from the account and then returned, refunded. But I notice you make arguments several times that the payment was never made. It was made and refunded because the assertion was that there wasn't a license to receive it. Sure. And so that attempt to make it— And there was an appeal taken from that. Yes, Your Honor. As I take the government's brief, they say essentially they were correcting an error that it should have been accepted. That's not what the director actually said. The director said that the examiner was constrained to refuse the filing. So payment was attempted. It was proffered. It was illegal. If I went to the store and handed the cashier $5 for— But that was appealed, right? It was appealed, Your Honor. The denial was appealed. Yes. And a denial was made on the failure to receive the payment, and the payment was denied because there was no license. The payment was— Refunded. —was refused. It was not accepted. It was refunded. Yes. Yes. All right. It's a difference. Let's keep it all straight. An appeal was taken from that, and that appeal was pending for 10 years. Correct, Your Honor. And on appeal, ultimately, the court reversed that and said the license has now been applicable, and the payment is received. And the question is, what's wrong with that? Sure. Your Honor, there's a lot of things wrong with that. One thing that is wrong with it is that the OFAC license didn't actually authorize that payment to the extent there was any payment at all. It didn't authorize a retroactive payment. It said you can engage in payments— Well, the law changed in between. The law changed while the appeal was pending, and the appeal then gave effect to the change in the law. Your Honor, a couple points on that. The change in the law was the license. So the law only changed in a way that enabled this decision if you read the license as retroactive, and you have basically a clear statement rule in the OFAC regulations that you have to be really clear that it's retroactive. I'm not understanding the license was retroactive. I'm suggesting that the license was allowed because of a change in governmental policy. And so the license is given in, what, 2016? Right. And so now the appellate agency, the director, says, okay, now that they got the license, the initial application is granted, reversing the original determination. Right. So you go back to the Lanham Act. The Lanham Act creates a 10-year term for registration. So you have to do certain things by certain dates. You have until the end of the registration period, that was 2006, to effect the payment. They did it timely. They did it in 2006. That was timely, wasn't it? If it had been lawful and effective, it would have been timely, but it wasn't. Well, but that's subject to appeal. The director could reverse that, right? Just like a district court and an appellate court. Yes. The district court does one thing. The appellate court reverses it. It's effective as when the district court operated on it. So, you know, there's a number of issues here. One is the retroactivity of the license. If this is not a retroactive license, I don't think that changes the law as it existed at the time that the payment was due. If this is not a retroactive license. The director approved the license in 2016. That was applied for in 2005, right? No, Your Honor. There was a license. I thought that's what he said in the opinion. If he said that in his opinion, then it is directly contradicted by the record. In 2005, there was an attempt to pay. There was reliance on a license that was not actually authorized. You keep saying an attempt to pay. There was an application to renew a trademark. And there was a payment made and the payment was received. It turned out during the next several months that they didn't have a license. They determined they didn't have a license to receive that money. The money was refunded. And the application was denied. An appeal was taken. That leaves it open, doesn't it, when the appeal is taken? Well, Your Honor, part of the issue here, and I want to just get back to this factual point, there was a license that was applied for in 2006 that was denied in 2006. Then there wasn't even a license application pending until I believe it was November of 2015. What was appealed? So the license, just to make a little clarity here, the license refers to something from OFAC. Correct, Your Honor. Right. The registration refers to something from the Patent Office. Correct, Your Honor. And so OFAC has licenses, Patent Office has registrations. Exactly. That's exactly right. So what was appealed was the registration. Yes. Not the OFAC license, although that may have also been appealed. That was also separately appealed. But what we're talking about goes to the director is not a license, but instead a registration. That's exactly right, Your Honor. And this is, even if Your Honor doesn't think that there's a contrary. But the issue in this case is the registration, the renewal, right? Yes. Okay. So the registration is appealed. Yes. And the commissioner or the director approves the registration in 2016. Yes. On appeal. Yes. So what's the issue? Your Honor, there's a lot of issues. I won't belabor the OFAC license. I know, but tell me what's wrong with the commissioner's or the director's decision. Okay. Well, the Lanham Act sets deadlines. It sets, you know, the whole point of this statute is to get it off the register. Can we talk just for a second about the statute? Sure. Just to help me understand it a little bit.  So I look at 1059A, and the part that's sort of relevant here is that there's a deficiency. Yes. So in December of 2005, there was an application filed. There was a deficiency. The office action the following summer then effectively says you've got to fix this deficiency. Yes. That's the payment. Within six months. Yes. All right. So then there's an appeal to the director.  And I presume you agree at that point the six-month deadline is effectively stayed because it's now been appealed. Your Honor, there is a separate regulation that says that petitions to the director don't stay your deadlines absent this decision. But for the time prescribed, right?  If you take an appeal, you cannot ever satisfy the deficiency. Right? That would be an odd result. So you think once — so the office action says you've got to do this within six months. Right? That's the time prescribed.  It then goes to the director, and the director comes back and says at J466, I'm suspending this action and presumably the deadlines that go with it until — he doesn't say this, but until 2012. Yeah. Well, Your Honor, I think I agree with a lot of that. I don't think the director suspended any — said the director suspended any deadlines. Your view is that in December of 2006 —  — despite the ongoing appeal, the QBEX board had to pay the fee as the lower-level person had suggested, regardless of the fact that the director had the matter. And if they didn't pay it by the end of 2006, it was forever cut off, and the appeal was then moot. So, you know, our position is it's not just the office action that set the six-month deadline. There is a regulation — That regulation doesn't remotely apply. So accept hypothetically that that regulation is totally irrelevant. All right. Just hypothetically accept it for me. All right. So the question is the office action says do it in six months, but you can appeal, and they appeal. It can't be that you're arguing they still had to do it in six months even though the director had the action. Well, Your Honor, the appeal wasn't about the time — It was about the deficiency. It was about whether there was a deficiency, right, because they want to come back and say, in fact, one of the challenges that they bring is OFAC's got this all wrong, right? We don't really need this. This license works, right? That's all about whether the payment should have been rejected or not. Yeah, and that is all fair, and I don't think that — But on appeal, two years later, beyond the six months, two years later, the director could say there was no deficiency, and the registration is accepted. That would be appropriate, right? Yes, Your Honor. Okay. Here's 10 years later, and he says the registration's appropriate. Because the director, you know, essentially here the delay was part and parcel of the decision, trademark registrations are supposed to expire. What you have here is essentially a pocket veto of the way the Lanham Act is supposed to work. But there's a cause of action for delay, right? If an agency is not acting within what you think is an appropriate amount of time, you can bring a cause of action for delayed decisions, right? But now there's been a decision. Right. So there's no longer a cause of action for delay. Now we're here talking about the decision that was made and whether there was authority to make it and whether it was arbitrary and capricious. Yes.  Yes, Your Honor. I think a delay can be relevant to the question, you know, separate from a cause of action, which, as Your Honor knows, is very difficult. Yeah. You're looking for something in the regulations or somewhere that says the director doesn't have the authority to take a really, really long time to decide. Or at a minimum, it's arbitrary and capricious. So, you know, to take Judge Niemeyer's point that the law changed while this petition was pending there, the only reason that happened is because of this completely unexplained and extraordinary delay that lasted the entirety of the term of the trademark registration from 2006 to 2016. But that happens in litigation. Somebody files a cause of action three days before the limitations apply, a run-out, and the district court dismisses it and said, oh, the three days, you didn't calculate it right. They appeal, and the Fourth Circuit says, no, it was timely. And we don't decide that for three years later. We're still deciding what happened at the time by the district court, and we send it back, and they can try the case, even though it's three years beyond the statute of limitations now because we made our decision three years later. Here, the director made his decision ten years later, but it was appealed, the deficiency was removed, and the registration was approved. Your Honor, and I think, you know, I just go to the basics of reasoned decision-making. Even if you accept, you know, Judge Rushing said the issues are authority, and then, you know, discretion and how that was exercised. Even if you accept that there was discretion to do this, that it was okay, you know, to wait this long, it was okay to treat this as, you know, to set this time period for correcting the deficiency, accepting Judge Richardson that the regulation didn't mandate a six-month period, it could be longer. You know, what the agency has to do is explain what it is doing and why it is due. All right. So help me understand that. So why is it so Bacardi didn't file the APA action for a delayed decision? That's correct.  And so why is it that the agency has to explain the delay when it makes the final decision? If you had challenged the delay, they would have had to explain the delay. That's fine. But we don't say that every final decision of the agency must articulate the reasons for every procedural step that took place before the final decision. I guess I don't understand how you think the agency was required to explain the delay when the delay had not been challenged. We got a final decision. They explained the final decision. You may think the final decision is wrong. I totally get that, right? And there are arguments to be had there. But this argument about the delay doesn't seem to be pertinent because you didn't challenge the delay. You've challenged the final agency action. And I would say throughout this time period, every signal that one could get from the agency was that they had no discretion. This will be deemed canceled, slash, expired. And so that's the explanation. But accepting your honor, even if your honor doesn't think that they needed to explain the delay, what they at least needed to explain, why did they get 10 years to secure the deficiency? The director could have decided, you know, on the hypothesis that this. Is that just saying they had to explain the delay? Why did they get 10 years to secure the deficiency? That's simply just recasting. You think they had to explain every procedural step along the way. If there is discretion here, I don't think that's a procedural step. And maybe that's the important point. It's statutory. The time prescribed after notification of the deficiency. Who do you think gets to decide the time prescribed? Who is the decision maker?  The agency. It's within their discretion. I understand you have this argument about the inapplicable regulation, but we're hypothetically assuming that it's totally inapplicable. All right. So but in that world, the agency is the one that has the discretion to decide. The agency has discretion. And the basic rule of reasoned decision making under the APA is it has to explain why it's exercising that discretion. Here, if that discretion is challenged, but not if some final decision is made, that's the rub I'm having. If you had challenged the delay, I totally get it, right? You know, unreasonably delayed adjudication. It's almost impossible to bring. I understand that. But, like, they would have had to explain themselves. But why do they have to explain themselves in the final adjudication? I don't think what I'm saying here is they had to explain the delay. If what happens here is they were granting, you know, accepting your honor that the director can say, I have discretion to decide what is the time to cure the deficiency. They were granting the application filed in 2005 for registration. So that registration application was timely. And they just granted it after a long delay on appeal. And I don't see procedurally why that's a problem except the delay period. Now, I tell you, I do wonder, and I might as well ask you this question. It seems to me like we're dealing with stolen property. And I can't understand why they get any rights at all based on the confiscation. Now, is that something in some other litigation? How did they get a trademark in 1976 in the first place? That's strange, isn't it? Yes, your honor. One of the claims in separate litigation is that they got that by lying to the PTO. And is that being litigated? That has been litigated very, very slowly. It is now currently being stayed. There's a lot here, your honor. I mean, when I start reading this record, and we have a confiscation of property along with the goodwill and the trademarks, and you guys got your trademark from that original owner. Yes, your honor. It seems to me Cuba Export got nothing. This is just intuitive based on those facts. And I was wondering why are we litigating this at all if Cuba Export never had title. I mean, it was stolen, so to speak. It's like trying to acquire property to a stolen Thunderbird and asserting rights on it. Judge Niemeyer, there could be a very long answer to that question. I'll just give you the very short answer, which is there's a lot of problems here. Is that still open, that issue that I just asked about? Yes, your honor. Oh, okay. Can I ask a follow-up question about the Arbitrary and Capricious Review? It seemed your discussion with Judge Richardson was about explaining, you know, maybe the director has to explain why she's granting so long to correct a deficiency. Yes, your honor. And you're distinguishing that from the delay. But then Judge Niemeyer pointed out, well, the director had two bases for her decision. The alternative secondary description was that there was a deficiency at the time that needed to be corrected later. But her first reason was that actually at the time that was the wrong, you know, in retrospect now we know that was the wrong decision at the time, that the payment was made timely, and now it is being accepted because now there's an OFAC license for it. So does your explanation about the arbitrary and capricious explanation by the agency apply to that first reason at all when there's no deficiency to correct? It does, your honor. How? It's a different arbitrary and capricious argument. The decision, the point I was making to Judge Richardson is the decision to set effectively a 10-year period as the time prescribed. Right, as opposed to 9 or 11 or whatever. 9 or whatever. It's a slightly different problem. So what the agency says, you know, this is all about reasoned decision making. The agency is invoking the authority to exercise supervisory authority in appropriate circumstances. Usually, the agency says that's because the examiner made a clear error. Here, the director says in her decision no error, the examiner was constrained to act as she did. Nonetheless, the circumstances are appropriate for me to exercise supervisory authority. That was not compelled under, there's no scenario in which the director's hands were tied in 2016 to do that. The director could have said. I'm sorry, I thought you were going to tell me why that explanation is arbitrary and capricious. Because there was, your honor, I don't think there was an explanation. It just said it's appropriate to exercise my supervisory authority. OFAC has produced a license. Now we have an OFAC license. It's been paid. And there's a whole host of policy questions about why that's a good reason, why should the director of exercise supervisory authority here? You know, there is a hypothetical world where Cuba Export had been a little more honest about what the state of the law and the state of the license was in 2006. And it just told the PTO, I'm not going to make this unlawful attempt to pay. I'm just going to tell you, unfortunately, I don't have a license, and I'll let you know when I do, you should grant this anyway. In that world, you know, there wouldn't have been. They had a license of a different ilk, and they thought that that license was appropriate at the time. The license was to the firm, the law firm. And the determination was made later, no, you had to have a license to pay for the United States to receive that. And it's not as if it's day one, everybody knew it was illegal. It was determined to be deficient, and that was reversed by the director. And if the director had made that decision, I've thought about this, and I think everyone was operating in good faith. And actually, this is something that happens in a lot of the cases that the PTO says. The director often says, you know, I think someone made a mistake here, but it was in good faith. Everyone was trying their best, and that's why I'm going to exercise supervisory authority. Part of the problem here is if there was discretion on the director, the director acted like she didn't have discretion. It's just 10 years later, now there's a license. What are you going to do? My hands are tied. So why isn't this analogous? You've been here all day, but why isn't this analogous to our first case? So the district court judge issues a decision, so the office action here issues a decision. And at the time it was made, it was totally reasonable, right? But while it remained on direct review, the Supreme Court issued a different decision. Reed OFAC issued a different decision. And so we now have the case, and we say, listen, like we now have to apply the Supreme Court. And the director says, well, listen, I have to apply OFAC, right? That doesn't seem like that seems like an obvious idea. And so I guess I'm having a little bit of trouble understanding why you think the explanation given isn't sufficient, right? So there was a ruling one way. OFAC changed its mind. Like we're effectively on direct appeal. Of course you've got to apply the OFAC ruling that applies now. Sure. Well, I think, you know, one way that this is different from what happened in the scenario. In the judicial setting, there's a hierarchy. There's district court, court of appeals, Supreme Court. Here you have PTO over here and OFAC over here. Everybody agrees with respect to the payment, OFAC's decision controls, right? The PTO can't say, screw you, OFAC, right? In the same way the Supreme Court controls us, OFAC controls payment. PTO can't thumb its nose at OFAC on that issue. It can't control whether there is a license. What it can do and what it has to do is decide does that meet the requirements of the Lanham Act. The Lanham Act says you have to pay by a particular time, and OFAC has this license. I think you have to then look at the license. Does it apply retroactively? If it doesn't apply retroactively, then all you have is an authorization to make a new payment. And then maybe the director should at that point exercise discretionary authority to set a 10-year cure period. But now we're into the second issue. The second is not the first issue. I understand. Thank you. Okay. Thank you, Your Honors. All right. Mr. Shaw. May it please the Court, Waley Shaw for the PTO. OFAC determined in 2016 that as a matter of U.S. foreign policy, Cuba export should be allowed to engage in all transactions necessary to renew its trademark, including the payment that Cuba export had made in 2005. Now, in light of that license and with all the required fees in hand, the director correctly determined that Cuba export's registration should be renewed, and the director gave two rationales. The principal rationale was that because the license retroactively validated the 2005 payment and the lack of a license for that payment was the only reason for the denial of an otherwise complete application, the director was now obligated to grant the renewal, accept the payment. The alternative rationale was that by providing payment in 2016, based on the new license Cuba export corrected any deficiency in the original application. Now, this Court can affirm on either ground, but I would like to start with the principal rationale, which is the retroactive validation of the 2005 payment. Now, that 2005 payment went through three different stages. First, as Your Honor identified, first it was accepted and posted to Cuba export's accounts, and that's where the funds stayed for actually about, I think it was about eight months, including through the original expiration date of Cuba export's registration. Then an examiner decided that the payment wasn't authorized and should be rejected, and then finally the director reversed that decision and decided that the payment was valid based on the new OFAC license and that the payment should be accepted. Now, Bacardi offers no reason to treat only the second of these three decisions as the sort of determinative or binding decision. If the examiner could wipe out Cuba export's original payment by refunding it, then Cuba export in turn wiped out the effect of that refund by refunding the refund, if that makes sense. Similarly, if the examiner could reverse the agency's original acceptance of the payment, then the director could reverse the examiner's rejection of that original payment. And that doesn't make, that's contrary to bedrock principles of administrative law. Those principles tell us that it is the director that exercises final authority on behalf of the agency to decide whether or not to accept a payment, to decide whether or not to renew a registration, and it is only the director's decision that is on judicial review before this court. Bacardi's contrary interpretation would create all sorts of absurd circumstances. It would mean, for example, that if the agency, for example, either because of a bureaucratic delay just didn't withdraw the funds in time or maybe the examiner just made an error and refunded the payment wrongly, that the applicant would now be completely disabled from making a timely payment and, in fact, could lose their registration for an error that was not of their own making and that was entirely due to the PTO. That would be like if you send your credit card company a payment and then some junior person at the bank erroneously sends your payment back, then the credit card company comes to you and says, well, you owe us a late fee and interest because you didn't make your credit card payment on time. You would be justifiably upset about that because that sort of the return of the funds is entirely an error on the bank's part and not yours. They're going to point out that they did, right, that Cubexport did pay a late fee, right? What's your argument to that? Yes. I'm happy to address that. So as I was saying earlier, the director offered two rationales, a principal rationale, which was the retroactive validation, which did not require the deficiency surcharge, and then also a sort of secondary alternative rationale, which is that Cubexport corrected the deficiency in its application. And if that rationale is correct, then Cubexport was required to pay a $100 deficiency surcharge. Now, the agency sort of withdrew the higher of those two fees, but the fact that the agency withdrew the higher amount doesn't mean that the underlying decision was invalid. Obviously, you know, if this court were to affirm on the principal rationale, maybe Cubexport could argue that they were overcharged by $100, but they haven't made that argument, and it's not presented before this court. It's also not a reason to overturn the decision of the director. Is there any limit in your view? Is there any limit on the director's ability to sort of like sit on these things? So, I mean, it seems fairly obvious that there was sort of a policy decision to sit, and maybe you want to fight the hypothetical, but except hypothetically, there was a policy decision to sit on this because we were in a time of significant change with respect to the United States' policy toward Cuba, and maybe this was one of the bargaining chips that were on the table. Is there any limit on that? I mean, it seems odd to have this scenario where the director can sit on an application for longer than the period that is being solved, right? I mean, I understand generally we think, like, there's pretty broad discretion in the time, but my goodness. Right. I mean, certainly a very long stay of proceedings is possible both in agency proceedings and all sorts of judicial proceedings, and there are sort of ultimate limits on that sort of discretion. For example, as Judge Rushing pointed out, there is a kind of action called a track action in which someone can ask for a court for a writ of mandamus to direct that an agency take action that is unreasonably. Well, we get this type of claim. We've had it several times now. We've written on it. But a lot of the statutes say that if the director doesn't act within so many days, he's deemed to have denied the appeal. I gather that's not in the Lanham Act. Right. There is no such limit in the statutes here, and, in fact, it's sort of the opposite. Congress expressly gave the director the discretion to prescribe, and now I'm speaking specifically to the second rationale. Congress expressly gave the director the power to prescribe how long an applicant should have to correct a deficiency in an application, and Congress did not set any limits on the exercise of that discretion. So to sort of for Bacardi to come in and- Well, but they did. So the office action set a deadline. I mean, the office action says you've got to cure this within six months. Why do you think the appeal sort of effectively suspended or stayed that deadline? I mean, the office action gave a time prescribed to cure the deficiency. I understand we're only in this second rationale bucket. Why did the appeal to the director, like, change that? I mean, your colleague points to the statute that says, you know, deadlines don't go away because of an appeal to the director. Right, because, as I was saying, Congress gave the agency whose powers are vested in the director the power to prescribe a deadline for correcting deficiencies. Now, the examiner set a six-month deadline, and, in fact, that's what they're supposed to do under the trademark manual of examining procedure. But the examiner is not the ultimate authority, doesn't have the final authority to act for the agency. That's the director. And the director can obviously change the deadline that's been prescribed by an examiner, and that's what happened in this case. And if the director didn't have that authority- And the director did that by virtue of what? Do you think that the six-month deadline was effectively stayed by virtue of the filing of the appeal, by virtue of the suspension of the process, right, pending this, you know, other proceedings that don't end until 2012, or by the final decision? Which of those do you think changed the office action six-month deadline? I think the best way to think about it is that the director, by accepting the correction, is implicitly extending the deadline to allow that correction. Retroactively. Yes. And I think that it has to be the case that the director has that authority, because otherwise, by the time the case reaches the director, that six-month deadline is always going to have expired. Sounds to me like the director implicitly reversed the deadline by accepting the registration 10 years late. I think that's- Or the payment, the payment 10 years late. Yes. I think that's correct, certainly correct for the second rationale that, yes, the director implicitly reversed the deadline that had been given by the examiner and then allowed a longer deadline, which allowed Cuba Export to cure- What would have happened if there had been no appeal taken to the director? Would that-would the office action then have been final? Yes. If there was no appeal to the director, then I think the PTO regulations require that the registration be canceled or expired, and so we wouldn't- That takes me to my big question. Why are we dealing with Cuba Export registration? I mean, every time they renew, it seems to me it should bring up the question of who's the proper owner of the trademark. To be honest, I am not-this is a large and sprawling litigation, and I'm not fully up to speed on those aspects of the case. Obviously, that is being litigated. There are proceedings-there have been proceedings before the PTO, before OFAC, and district court. There's a cancellation proceeding where Cuba Export is trying to cancel-I'm sorry. Bacardi is trying to cancel Cuba Export's registration to the Havana Club mark based on- Confiscation. I'm not familiar with all the arguments in those cases, so certainly those are potential issues, but that is to be decided in other proceedings. It is not part of this case. This case is about whether, based on the arguments that have been made, the director properly renewed Cuba Export's registration on one of the two rationales. Can I ask just a random question? So all this is about paying fees, and now Cuba Export couldn't pay fees, but the appeal to the director required the payment of a $100 fee, right? There's an appellate fee. Why was Cuba Export allowed to pay that $100 fee? Right? Do you see what I'm saying? They weren't allowed to pay $500, and then, you know, they're told they can appeal, and they are allowed then to pay the $100 fee to appeal. How is that, and is that-was that void at the time it was given? What do I do with that? That seems odd. Yeah, I mean, that's not an argument that's been raised by- I understand, but I'm asking. Yeah, and I-so to be honest, I don't know. I assume that there was-you know, the licenses that are before this court are not the only licenses that have, you know, have been at issue. So, for example, there was a specific license that was granted to Robeson Gray to represent Cuba Export. So maybe that included litigation fees but didn't include registration fees or something.  That may be the case, or there may be another specific or general license that authorized that appeal fee. I just don't know. But no party has raised it, and I assume that's because there was no issue as to whether that fee was authorized. This is all about rum. Havana rum. Yes, that's correct. All right. Anything more? I just wanted to take issue with Bacardi's characterization of the license as not applying retroactively. The license specifically referenced the payment that was made in 2005, and so the only reason for OFAC to specifically reference that past payment was to retroactively authorize it. Let's see. Your colleague on the other side says, listen, they say they can take present action with respect to that, but it doesn't say it's retroactive. Right. And I think to answer that, I would look to Bacardi's, I'm sorry, to OFAC's regulation. So at 31 CFR 515.203C, the – Wait, 515.203C? Yes. OFAC's regulations expressly provide that an appropriate license or other authorization issued by or pursuant to the direction or authorization of the Secretary of the Treasury before, during, or after a transfer shall validate such transfer or render it enforceable to the same extent as it would be valid or enforceable apart from the Cuba sanctions. So here, this is your reverse of the reversal point. No. My point here, I guess, is just to explain why we should interpret the license that was given to retroactively validate the 2005 and to direct that that payment be treated as valid and legally effective. And that's to say that this regulation says that when OFAC authorizes a past transaction, then that authorization is retroactive to the date of that transaction. It's sort of a rule of construction, I guess, of licenses. What do we take to be the effect of this license that's been given? And because the license did refer to the past 2005 transaction, then it retroactively validated that transaction. And I would also point out that once— It could have been clearer because OFAC really speaks in the present tense in their ruling. What OFAC actually said is they use the verb to engage, and to engage is actually not present tense. That's an infinitive, which doesn't carry a tense. But I think the more important point is that the license specifically referenced the payment. Finally, I would just say that with regard to the first rationale, the retroactive validation rationale, I would disagree with Bacardi that the director had discretion because what was presented to the director was an otherwise complete application, a payment that the examiner had refunded and rejected solely because of the lack of an OFAC license. And now the director was presented with a license that retroactively validated the payment. The CUBA export had properly preserved the issue by filing a timely petition to the director. So by the time the director decided the case, the director had to apply the law as it stood at the time of decision, and the only result the director could reach was to, in fact, accept the payment as valid and, therefore, renew the registration. If the court has no further questions. Thank you very much. All right. Mr. McElrowley. Thank you, Your Honors. Carl McElrowley for intervenor appellee CUBA export. I agree with everything that Mr. Shaw just said. I would like, though, to start by addressing Judge D. Myers' question about why this registration is in CUBA export's name at all. The Cuban government did not confiscate the U.S. registration. It couldn't have. It has no power over U.S. registration. No, but didn't it confiscate the business? It did nationalize the business back in 1961. It nationalized the business. And, of course, trademarks go with a business. They can only be linked to a business. A trademark doesn't stand independently of a business. That's right. That's right, Your Honor. But what happened is, in 1973, the original owners allowed their trademark registration to expire. At that point, it was, as Bacardi itself pointed out, deadlines matter. At that point, the trademark was open for anybody to register. CUBA export did register it at that point. I think allowing it to expire, it had no business. The business was confiscated. There's a concept of excusable non-use. If you have other former Cuban trademark owners have been allowed to register on that basis that the expropriation of their property allowed them, gave them an excuse for not using the trademark. They could have filed it. They could have claimed excusable non-use. They didn't. Be that as it may, CUBA export got its registration in 1976. That started a five-year period running for them to challenge the registration. The only exceptions to that five-year are fraud, abandonment, and maybe one or two others. They did not. After that five years, there was— Uncontestable, is that the word? It's a concept related to uncontestability. It's not exactly the same thing, but it is. Bacardi then, many years later, decades later, brought a claim that's now still pending. Twenty-two years later in the District of Columbia, there have been multiple proceedings and things have been stayed in favor of each other. They did try to frame it as a claim for fraud. That is still pending, but that's not before this court. That's before another court. I see my time has already expired since I only took two minutes. Thank you, Your Honor. All right. Mr. Zients, you have a few minutes. Thank you, Your Honor. I'll just make a few points. One, the issue was raised about didn't the filing of the petition stay the obligation to cure Section 2.146G of the regulation? The mere filing of a petition to the director will not act as a stay. Then it goes on. But it preserves the issue. In other words, the director could reverse. And when the director reverses, that removes the deficiency. If the director concludes that there never should have been a deficiency to begin with, absolutely. I just want to make the narrow point that there's no stay of the time. If there was a deficiency and the issue is how long do you have to cure it, you're filing a petition. And it says unless the end of this, except when a stay is specifically requested. QBAC's court didn't request a stay. They had no reason to think they were ever going to get a license. They made a whole other set of arguments about why they shouldn't be required. We have the same thing in the judiciary. You request a stay and don't request a stay, and the plaintiff can start enforcing the judgment and so forth, but the court of appeals can still reverse and vacate the judgment. I mean, just as a director can reverse the deficiency. Sure, if there is a basis for concluding that. The second point I want to make, I think Judge Richardson asked the question to the government, doesn't this give you limitless discretion here? I didn't hear a no. I didn't hear what the limits would be to that. It really is striking that this effectively the exercise- We give lots of discretion in lots of places, right? Maybe even more today than we did a decade ago, right? And I would say two things about that. One, this was discretion used in a way that effectively nullified the scheme. This is supposed to expire. This is a ten-year registration period. It wipes that out. But that could have been challenged. I mean, that decision could have been challenged. We have a mechanism for doing that. With respect to that, I don't think that's not the delay challenge. That's the decision. Mr. Shaw said that the director implicitly extended the deadline by ten years. Okay, that was final agency action, not a delay. A decision to give ten years to cure. So that was, even Judge Richardson accepting that that's one of these ways in which the agency has a lot of discretion, well, the agency also has to explain why. And when the agency is doing something that runs headlong into this very time-bound statutory scheme, at least you could expect some recognition that in a normal course you get six months. That's what the trademark manual says is the normal policy. There was some decision here to treat this as an exceptional and basically give a benefit to those who have stolen this trademark. Explain why in this case that discretion, if it existed, was exercised. That's rationale two. Going back to rationale one, my friend Mr. Shaw says he disagrees that the director had any discretion whatsoever once OFAC had given the license. A couple points about that. No one has a right. This isn't the Fourth Circuit. The director must sit in review of every single denial of a renewal, of every single decision by an examiner. There is discretionary authority to exercise supervisory authority in appropriate circumstances. That's what the regulation says. So there's absolutely discretion to say, you know what, this is not an appropriate circumstance to give a benefit to Cuba Export 10 years later after holding this open for reasons that I'm not going to explain. Actually, that's not totally fair. Didn't the director recognize that the application was for registration, renewal, was all in order except for the payment license from a different agency? And when the different agency finally gave its authority for that license, he said that removes the only objection because otherwise the application was in order. There was nothing wrong with the application, was there? You haven't challenged the application except for the payment. Right, but that's in which there's a statutory element. And the payment was challenged because of an interpretation about a license requirement. The law firm did have a license, but it was construed not to cover the receipt of payments. Right, and from 2006, excuse me, 2005 until basically the end of 2015. Well, that's criticizing basically the agency for sitting on it. I think it's a legitimate criticism, but I'm not sure that's before us. Sure, but then the last, I have very little time left. I just want to make sure I get this in. Rationale 1, I think the government would agree with this. Rationale 1 only works if this was a retroactive license. The regulation says it's not retroactive unless it specifically so provides. JA 523 is the OFAC license. It does not specifically provide it. It says you have authorized to engage. I won't get into infinitives versus present tense. It says authorized to engage in transactions related to the 2005 application and the payment reference therein. A new payment in 2016 absolutely is related to the application and the payment reference in 2005. So there's an entire reason. What's your response to the 203C rule of construction argument? I think, you know, 515. I wrote down 203C. Maybe it might be something else, but the rule of construction argument that your colleague suggested. The rule of construction is, I think, in our favor, that it is not retroactive unless it specifically so provides. Maybe I'm misunderstanding. Right, but the question is, what is specificity? Does specificity require magic words? You might imagine it said, unless you say retroactive, it doesn't count. The other thing you might say is, like, it requires specificity, and that is, like, giving the December 2005 date is itself specificity, right? It's specific about what the retroactive piece is. Well, it talks about the payment referenced in a December 14, 2005 application, and it authorizes all transactions. You can engage in all transactions, including those related to that payment. So if we didn't have that clear statement rule in the regulation, maybe, but it's sort of like when the Supreme Court recognized a kind of clear statement principle. If this license can be read two ways, and I think that is a fair description of this license, if it can be read two ways, then I don't think that meets the clear statement principle in this idea of specifically so provides. Can I, with your permission? Sure. I'm just trying to make sure I understand this line. Imagine a world that the license said all the magic words, right? We give authority to be retroactive in every specification that would make you happy. In that scenario, wouldn't QBEXport still have to take an action? Because currently the money has been returned, right? And so they would still have to take an action. That is, listen, we tried to give you this money once. You told us no. We're giving it back to you now. Draw it down from my account or from my Ropes and Gray account. They would still have to do something in order to make it retroactive. So I guess I'm not sure why the, you know, to take action undermines the retroactivity point, because everybody agrees whether it's retroactive or not, there has to be some present action taken to effectuate even a retroactive payment. Right. And I guess that's sort of a separate one of our arguments, which is why we think your rationale one doesn't work. You know, the payment actually happened. They had to do something to finish the payment in 2016. My point is only, I think OFAC, you know, OFAC doesn't get to decide how things work under the Lanham Act, what counts, when is good enough. OFAC was asked for a license for certain. Why would it, if it was just given a license in 2016, why would it refer back to 2005? It's a six, five. Well, it was referring to, you know, I think QBEXport made, often OFAC will refer back to an application that was made in the request. You know, OFAC, you know, certainly QBEXport, you know, wanted, thought that they, you know, they could complete this transaction that they wanted to engage in in 2005. It was referring to that. I think what OFAC did is it said, okay, now you can engage in transactions that are related to that 2005 application, and then OFAC is done. And then it's the PTO's job to say, you know, should I, you know, how does this affect the timing requirements under the Lanham Act? Should I exercise my discretionary supervisory review authority under 2.146A3? And how does this all work? And then, you know, explain why I'm doing that. Okay. Thank you, Your Honor. We'll adjourn court for the day and come down to Greek Council. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Paul V. Niemeyer, Julius N. Richardson, Allison J. Rushing